United States District Court
District of Connecticut
FILED AT   BRIDGEPORT

10/22

Roberta D. Tabora, Clerk   2014

Deputy Clerk

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

THE UNITED STATES OF AMERICA
ex rel. MICHAEL COWAN,

    Plaintiff,

v.

JHW GREENTREE CAPITAL L.P, J.H.
WHITNEY & CO., PETER M. CASTLEMAN,
MICHAEL R. STONE, DANIEL J. O'BRIEN,
STEVEN LOGAN, GARMARK PARTNERS II
L.P., E. GARRETT BEWKES III, WESTWIND
INVESTORS L.P., PRAIRIE FIRE CAPITAL
LLC, PTOLEMY LLC, THE CASTLEMAN
FAMILY FOUNDATION, and THE MICHAEL
AND KAREN STONE FAMILY FOUNDATION,

    Defendants.

CASE NO. 14 cv 1556 MPS
*SEALED*

FILED *IN CAMERA* AND UNDER SEAL
PURSUANT TO 31 U.S.C. §3730(b)(2).

DO NOT PLACE IN PRESSBOX
DO NOT ENTER ON COMPUTER
DOCKET

## PLAINTIFF'S ORIGINAL COMPLAINT
## [FILED UNDER SEAL]

Dated: October 22, 2014

ST. ONGE STEWARD JOHNSTON &
REENS LLC

GENE S. WINTER
Connecticut Bar No. Ct 05137
gwinter@ssjr.com
986 Bedford Street
Stamford, Connecticut 06905-5619
Telephone:  (203) 324-6155
Facsimile: (203) 327-1096

FISH & RICHARDSON P.C.

JOHN S. GOETZ
*(admission pending)*
Connecticut Bar No. 423408
goetz@fr.com
601 Lexington Avenue, 52nd Floor
New York, New York 10022
Telephone: (212) 765-5070
Facsimile: (212) 258-2291

NATALIE L. ARBAUGH
(*pro hac vice* admission pending)
Texas Bar No. 24033378
arbaugh@fr.com
JOHN MICHAEL GADDIS
(*pro hac vice* admission pending)
Texas Bar No. 24069747
gaddis@fr.com
1717 Main Street Suite 5000
Dallas, Texas 75201
Telephone: (214) 747-5070
Facsimile: (214) 747-2091

**Attorneys for Relator
MICHAEL COWAN**

## TABLE OF CONTENTS

I.    INTRODUCTION ............................................................................................. 1

II.   FILING UNDER SEAL ..................................................................................... 4

III.  THE PARTIES ................................................................................................. 5

IV.   JURISDICTION AND VENUE ....................................................................... 9

V.    APPLICABLE LAWS ................................................................................... 10

      A.   The False Claims Act ........................................................................... 10

      B.   The Small Business Investment Company Program ............................. 11

           1.   Prohibitions on Self-Dealing and Conflicts of Interest. ............ 11

           2.   Certifications of Compliance. ................................................... 13

           3.   Receivership and Recovery from Troubled SBICs. .................... 14

VI.   DEFENDANTS' SELF-DEALING SCHEME TO DEFRAUD THE SBA .................. 15

      A.   The Greentree SBIC and its Holdings. ................................................. 15

      B.   Defendants' Self-Dealing Scheme. ...................................................... 19

           1.   Defendants Divert Greentree's Funds To Support Their Separate
                Private Investments in Failing Companies. ................................ 20

           2.   Defendants Hijack Investment Opportunities Away From Greentree. ...... 24

           3.   Defendants Sabotage STOP's Efforts To Attract Outside Investment. .... 26

           4.   Defendants Take Control of STOP and Disregard SBA Regulations. ...... 28

      C.   Relator Michael Cowan Warns Defendants About SBA Regulatory
           Violations. ........................................................................................... 32

      D.   Defendants Manipulate Greentree's Receivership to Acquire STOP for
           a Fraction of its Value. ......................................................................... 35

           1.   Defendants Drive Greentree into Receivership. .......................... 35

           2.   Defendants Deceive the Receiver. .............................................. 36

        3.      Defendants Acquire Greentree's Remaining Interest in STOP. ............... 38

    E.    Defendants Sell STOP for a Massive Profit; the SBA Gets Nothing. ................... 39

VII.    COUNT 1 (VIOLATION OF FALSE CLAIMS ACT, 31 U.S.C. § 3729(A)(1)(G)) ...... 42

VIII.    COUNT 2 (VIOLATION OF FALSE CLAIMS ACT, 31 U.S.C. § 3729(A)(1)(C)) ....... 45

IX.    PRAYER FOR RELIEF ................................................................................................ 46

X.    DEMAND FOR JURY TRIAL .................................................................................... 47

## PLAINTIFFS' ORIGINAL COMPLAINT [UNDER SEAL]

Relator Michael Cowan ("Relator") files this original complaint under 31 U.S.C. § 3729, *et seq.* (the "False Claims Act" or "FCA"), to recover damages, penalties, and other remedies established by the False Claims Act on behalf of the United States.

## I.   INTRODUCTION

This is a case about fraud, deception, and self-dealing by wealthy investors who abused their control of a federally subsidized small-business investment company to enrich themselves at the expense of the taxpayer. The focus of the unlawful scheme was a troubled private equity firm named JHW Greentree Capital L.P. ("Greentree"), which obtained over $98 million in federal funds under the Small Business Administration ("SBA")'s Small Business Investment Company ("SBIC") program before it was driven into financial collapse and receivership in 2012 as a result of improper self-dealing transactions by its principals. Using a series of improper transactions and fraudulent and misleading statements, Defendants first steered Greentree's resources into failing companies in which they had personally invested. Next, they stripped Greentree of its few well-performing investments and sold them to their own profit for a gain of nearly $100 million, leaving Greentree with an assortment of worthless holdings and the SBA with a loss of over $93 million – one of the largest losses in the history of the SBIC program.

Peter Castleman and Michael Stone, two of Greentree's controlling principals, also had substantial personal investments in other, private funds they controlled that had "co-invested" in several of the same businesses in which Greentree had invested its SBA funds, and the resulting conflicts of interest led Castleman, Stone, and their co-conspirators to make a series of

investment decisions that favored their own personal financial interests at the expense of Greentree's and the SBA's interests. After the majority of Greentree's small-business holdings began to founder during the 2008–2009 economic downturn, Defendants steered Greentree's resources toward several troubled companies in which their private funds were heavily invested. In so doing, they repeatedly violated applicable statutes and regulations by failing to disclose the insider nature of their transactions and by falsely certifying their compliance with SBA regulations.

At the same time, Defendants conspired to strip Greentree of its few successful holdings and investment opportunities. Of the fourteen businesses in Greentree's investment portfolio, the only one to successfully weather the 2008–2009 economic downturn was Satellite Tracking of People, LLC ("STOP"), a provider of GPS tracking equipment for ankle bracelets used by parolees, probationers, registered sex offenders, and other persons under law enforcement or correctional supervision. STOP's prospects and revenues continued to rise year over year as it expanded its business by winning major government contracts. However, as long as STOP remained within the Greentree SBIC, the SBA was entitled under federal regulations and Greentree's partnership agreement to first priority in any distribution of its profits. In order to profit from STOP's business success, Castleman and his associates needed to take control of STOP away from Greentree and transfer its equity to their separate private funds, where they could avoid sharing its profits with the SBA. To that end, Castleman repeatedly sabotaged STOP's efforts to obtain needed financing from outside investors. In March 2010, having blocked other sources of funding, Castleman's consortium of insiders took majority control of STOP's board of directors, refinanced insider-held debt at substantially higher cost, and diluted

Greentree's interest in STOP by investing unnecessary new equity capital at a substantially below-market price, to the detriment of Greentree's investment. Greentree, which was effectively controlled by Castleman and Stone, did not protest this clearly unfavorable treatment. Nevertheless, the transaction violated SBA regulations in several respects, and Greentree should have disclosed the insider relationships to the SBA and sought its advance permission. Relator Michael Cowan, who worked for Castleman as one of Greentree's managers and handled Greentree's relationship with the SBA, repeatedly warned Greentree's principals that the transaction likely violated SBA regulations and that they needed to seek the SBA's approval. In response to one such warning, Greentree's Managing Member and Principal, Daniel O'Brien, said in an April 8, 2010 e-mail:

> *"I know in the minds of the SBA 'rules are rules' but it seems crazy to just give away economics other co-investors are enjoying."*

Willfully disregarding Relator Cowan's advice, Defendants went ahead with their insider transaction and took control of STOP, concealing from the SBA key facts which, if the SBA had known them, would likely have led the SBA to disapprove the deal. These false statements and material omissions violated both SBA regulations and the False Claims Act.

By 2012, Defendants' self-dealing and mismanagement had driven Greentree to financial collapse, with some of its portfolio holdings in bankruptcy and most of the others – except for STOP – worth substantially less than what Greentree had paid for them. The SBA brought a civil action in this Court to put Greentree into receivership, and a court-appointed SBA Receiver took over Greentree's operations in order to marshal and sell off its assets in an effort to recover some fraction of the $93 million Greentree still owed the government.

Greentree's financial collapse gave Defendants the opportunity to complete their acquisition of STOP, the only profitable company in its portfolio. Defendants manipulated and abused the receivership process to acquire Greentree's remaining interest in STOP for $3.25 million, a small fraction of its market value. On information and belief, Defendants did this by concocting a skewed appraisal report stating an unrealistically low valuation, and by convincing the SBA's Receiver not to undertake a due diligence process that might identify other potential buyers willing to pay a higher price. After successfully acquiring STOP from the Receiver at a bargain-basement price, Defendants turned around and re-sold STOP on the market one year later for a price that was *eighteen times* what they had paid the SBA for it. Defendants profited as much as $95 to $100 million from this transaction. If Greentree had held onto its interest in STOP and then participated in the 2013 market sale, it could have collected as much as $57 million (plus an additional $8 to $9 million if its equity had not been diluted in the March 2010 insider deal), all of which would have been applied to pay down the bulk of Greentree's $93 million in outstanding obligations to the SBA. Instead, as a result of Defendants' deception and self-dealing, taxpayers are left holding the bill for one of the largest failures in the history of the SBA's small-business investment program.

## II.    FILING UNDER SEAL

1.    In accordance with 31 U.S.C. § 3730(b)(2), this complaint is filed *in camera* and under seal and will not be served on the Defendants until the Court so orders. Also in accordance with 31 U.S.C. § 3730(b)(2), a copy of this complaint and a confidential written disclosure of substantially all material evidence and information that Relator currently possesses have been provided to the United States Attorney General's Office.

2.      Plaintiff's Disclosure Statement is supported by the material evidence known to Relator at the time of this filing establishing the existence of Plaintiff's False Claims Act claims. Because the statement is submitted to the Attorney General and to the United States in their capacity as potential co-counsel in the litigation, the Relator understands this disclosure to be privileged and confidential.

## III.    THE PARTIES

3.      Plaintiff Michael Cowan ("Cowan" or "Relator") is a citizen of the United States and a resident of the State of Florida.   Mr. Cowan had worked for Defendants Peter M. Castleman and J.H. Whitney & Co. since 2000.   Between 2004 and the beginning of 2010, Mr. Cowan handled the day-to-day operations of Defendant JHW Greentree Capital, L.P., including its relationship with the SBA.

4.      Mr. Cowan is referred to as "Relator" or "Plaintiff."   Relator brings this action based on his direct, independent, and personal knowledge, and also on information and belief. He brings this action against Defendants for violations of the federal False Claims Act, 31 U.S.C. § 3729 *et seq.*, for the United States and for himself, pursuant to the authority granted by 31 U.S.C. § 3730(b).

5.      Relator is an original source of the information underlying this Complaint and provided to the United States.   He has direct and independent knowledge of the information on which the allegations are based.   Relator is contemporaneously providing to the United States Attorney General a Confidential Disclosure Statement which presents substantially all material evidence and information Relator currently possesses, pursuant to 31 U.S.C. § 3730(b)(2).

6.      Defendant JHW Greentree Capital LP is a limited partnership organized under the laws of Delaware, and an SBIC licensed by the SBA pursuant to the federal Small Business Investment Act, 15 U.S.C. §§ 662 *et seq*. Prior to February 10, 2012, it maintained its principal place of business in New Canaan, Connecticut.   After Greentree entered receivership, its headquarters and records were transferred to SBA offices in Washington, D.C. under the supervision of a court-appointed receivership.   Defendant Greentree may be served with process through its Receiver, the United States Small Business Administration, Office of General Counsel, 409 3rd Street S.W., 7th Floor, Washington DC 20416.

7.      Defendant J.H. Whitney & Co. LLC ("Whitney") is organized under the laws of Delaware and has its principal place of business at 130 Main Street, New Canaan, Connecticut 86840.   Defendant Whitney may be served through its registered agent, United Corporate Services, Inc., 874 Walker Road Suite C, Dover, Delaware 19904.

8.      Defendant Peter M. Castleman ("Castleman") is one of the Principals and managing members of Defendant Greentree.   On information and belief, Castleman was a resident of Connecticut as recently as 2010, and currently resides in Nevada.   Castleman was a Managing Partner of Defendant Whitney up through 2010, and is the founder of Defendant Westwind Investors, L.P.   Defendant Castleman may be served at 917 Tahoe Boulevard, Suite 200, Incline Village, Nevada 89451.

9.      Defendant Michael R. Stone ("Stone") is one of the Principals and managing members of Defendant Greentree.   On information and belief, Stone currently resides in La Jolla, California.   Stone was previously a Managing Partner of Defendant Whitney.   Defendant Stone may be served at 1250 Prospect Street, Suite 200, La Jolla, California 92037.

10.     Defendant Daniel J. O'Brien ("O'Brien") is one of the Principals of Defendant Greentree, and reviewed and signed Greentree's financial reports in his capacity as Managing Member of Greentree's General Partner, JHW Greentree Capital GP, LLC.  On information and belief, O'Brien currently resides in Connecticut.  Defendant O'Brien may be served at 267 Main Street, Unit A, Ridgefield, Connecticut 06877.

11.     Defendant Steven Logan is the Chief Executive Officer of Satellite Tracking of People, LLC, a company which received government-backed investments from Defendant Greentree and which was subsequently acquired by the other Defendants in the improper transactions that are at issue in this action.  On information and belief, Defendant Logan currently resides in Houston, Texas.  Defendant Logan may be served at 11105 South Country Squire Street, Houston, Texas 77024.

12.     Defendant GarMark Partners II, L.P. ("GarMark") is a limited partnership organized under the laws of Delaware and has its principal place of business at 1 Landmark Square, Suite 600, Stamford, Connecticut, 06901.  On information and belief, GarMark is controlled by Defendant E. Garrett Bewkes III, and Defendants Castleman and Stone also have substantial investments in GarMark.  Defendant GarMark Partners II, L.P. may be served through its registered agent, Corporation Service Company, 271 Centerville Road, Suite 400, Wilmington, Delaware 19808.

13.     Defendant E. Garrett Bewkes III ("Bewkes") is the founder and Managing Principal of GarMark.  On information and belief, Bewkes currently resides in Connecticut. Defendant Bewkes may be served at 774 Hollow Tree Ridge Road, Darien, Connecticut, 06820.

14.     Defendant Westwind Investors LP ("Westwind") is organized under the laws of Delaware and has its principal place of business at 917 Tahoe Boulevard, Incline Village, Nevada 89451.  On information and belief, Westwind is controlled by its founder, Defendant Castleman.  Defendant Westwind may be served through its registered agent, United Corporate Services, Inc., 874 Walker Road, Suite C, Dover, Delaware 19904.

15.     Defendant Prairie Fire Capital, LLC is organized under the laws of Delaware and has its principal place of business at 917 Tahoe Boulevard, Incline Village, Nevada 89451.  On information and belief, Prairie Fire Capital LLC is controlled by Defendant Westwind and/or Defendant Castleman.  Defendant Prairie Fire Capital LLC may be served through its registered agent, United Corporate Services, Inc., 874 Walker Road, Suite C, Dover, Delaware 19904.

16.     Defendant Ptolemy Capital, LLC is organized under the laws of Delaware and has its principal place of business at 917 Tahoe Boulevard, Incline Village, Nevada 89451.  On information and belief, Ptolemy Capital, LLC is controlled by Defendant Stone.  Defendant Ptolemy Capital, LLC may be served through its registered agent, Corporation Service Company, 2711 Centerville Road, Suite 400, Wilmington, Delaware 19808.

17.     Defendant the Castleman Family Foundation is a private nonprofit foundation located at 917 Tahoe Boulevard, Suite 200, Incline Village, Nevada 89451.  On information and belief, the Castleman Family Foundation is controlled by Defendant Castleman.

18.     Defendant the Michael and Karen Stone Family Foundation is a private nonprofit foundation located at 501 Silverside Road, Suite 123, Wilmington, Delaware 19809.  On information and belief, the Michael and Karen Stone Family Foundation is controlled by Defendant Stone.  Defendant the Michael and Karen Stone Family Foundation may be served

through its registered agent, Foundation Source Philanthropic Services, Inc., 55 Walls Drive, Fairfield, Connecticut 06824.

## IV.    JURISDICTION AND VENUE

19.    This Court has subject matter jurisdiction over this action pursuant to 31 U.S.C. § 3732(a), 28 U.S.C. §§ 1331 and 1345, and 15 U.S.C. § 687 *et seq*.

20.    There have been no public disclosures of the allegations or transactions contained herein that bar jurisdiction under 31 U.S.C. § 3730(e).

21.    This Court has personal jurisdiction over the Defendants because, among other things, Defendants transact business in this District and/or engaged in wrongdoing in this District.  Entity Defendants Greentree, Whitney, and GarMark either currently maintain their principal places of business in this District or did so during the time period relevant to this action.  Individual Defendants Castleman, Stone, O'Brien, and Bewkes either currently reside and/or work in this District, or did so during the time period relevant to this action.  Furthermore, because all Defendants are citizens and/or residents of the United States, personal jurisdiction exists under Fed. R. Civ. P. 4(k)(1)(C) because the False Claims Act authorizes service of process throughout the United States.  31 U.S.C. § 3732(a).

22.    Venue is proper in this District under 31 U.S.C. § 3732(a) and 28 U.S.C. §§ 1391(b) and (c).  All Defendants either currently transact business within this District, and/or did so during the time period relevant to this action; Defendants Whitney, GarMark, and Bewkes can currently be found and reside in this District; and acts proscribed by 31 U.S.C. § 3729 occurred in this District.

## V.    APPLICABLE LAWS

### A.    The False Claims Act

23.    The False Claims Act ("FCA"), in relevant part, imposes liability on any person

who:

> (G)    knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government; or
>
> (C)    conspires to commit a violation of subparagraph . . . (G).
>
> 31 U.S.C. § 3729(a)(1).

24.    Under the False Claims Act, the terms "knowing" and "knowingly"

> (A)    mean that a person, with respect to information—
>
> > (i)    has actual knowledge of the information;
> >
> > (ii)    acts in deliberate ignorance of the truth or falsity of the information; or
> >
> > (iii)    acts in reckless disregard of the truth or falsity of the information; and
>
> (B)    require no proof of specific intent to defraud.  31 U.S.C. § 3729(b).

25.    Under the False Claims Act, the term "obligation" means "an established duty, whether or not fixed, arising from an express or implied contractual, grantor-grantee, or licensor-licensee relationship, from a fee-based or similar relationship, from statute or regulation, or from the retention of any overpayment."  *Id.* § 3729(b)(3).

26.    Under the False Claims Act, the term "material" means "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property."  *Id.* § 3729(b)(4).

27.    A person violates the False Claims Act not only by fraudulently obtaining money *from* the government (the classic "false claim"), but also by using or causing a false record or statement to be used *in order to diminish or avoid an obligation owed to* the government. Such a violation is known as a "reverse false claim." *See, e.g., U.S. ex rel. Matheny v. Medco Health Solutions, Inc.*, 671 F.3d 1217, 1221–22 (11th Cir. 2012) (explaining elements of a "reverse false claim" under § 3729(a)(1)(G)); *U.S. ex rel. Conner v. Veluchamy*, No. 11-cv-4458, 2014 U.S. Dist. LEXIS 946, at *4 (N.D. Ill. Jan. 3, 2014) (same). Liability for a "reverse false claim" can be indirect as well as direct – *i.e.*, a party not itself obligated to the government can nevertheless be liable for knowingly causing other parties to improperly impair or avoid their obligations to the government. *See, e.g., U.S. v. Caremark, Inc.*, 634 F.3d 808, 816–17 (5th Cir. 2011).

**B.    The Small Business Investment Company Program.**

28.    In 1958, Congress created the SBIC program in order to facilitate the flow of long-term capital investment to American small businesses. The SBA administers the SBIC program as a partnership between public and private investment. The SBA does not provide capital directly to the small businesses, but instead works through licensed private investment companies (the SBICs) which select and invest in qualified small businesses using a combination of SBA funds and private investor funds. The Small Business Investment Act ("SBIA"), 15 U.S.C. § 681 *et seq.*, empowers the SBA to enact rules and regulations governing the conduct of SBICs.

**1.    Prohibitions on Self-Dealing and Conflicts of Interest.**

29.    Given the dependence of the SBIC program on private money managers and private investors, it is a paramount concern of the SBA to ensure that these private managers and

investors do not pursue their own economic interests at the expense of the small businesses in which they have invested or put at risk the SBA's money.  Accordingly, the SBIA and its related regulations place a heavy emphasis on prohibiting self-dealing and regulating conflicts of interest that might interfere with the SBIC program's overriding purpose of supporting the development of American small businesses.  *See* 15 U.S.C. §§ 682 (requiring "diversification" between management and ownership of the SBIC); 687 (prohibiting conflicts of interest); 687b(c) (requiring that an "examination" of each SBIC be conducted every two years, to determine whether, among other things, "it has engaged in prohibited conflicts of interest").  An SBIC must certify its compliance with SBA regulations both when receiving money from the SBA, and also when investing money in its portfolio businesses.  *Id.* § 687(h).  False statements and material omissions are prohibited, and are grounds for suspension or revocation of the SBIC's license.  *Id.* § 687a.

30.     The SBA's regulations prohibit an SBIC from engaging in self-dealing financial transactions with insiders ("Associates") without obtaining prior permission from the SBA. These "insiders" include:  managers of the SBIC, or persons or owners who directly or indirectly control 10% or more of its equity; or managers, owners, or agents of an entity directly or indirectly controlling 10% of the entity's equity; or any portfolio company which is managed or at least 10% owned or controlled by any insider or by any entity controlled by an insider.  *See* 13 C.F.R. §§ 107.730 (defining prohibited insider transactions); 107.50 (defining "Associate" and "Control Person"); *cf.* 107.150 (requiring that at least 30% of the ownership of the SBIC be by persons or entities "diverse from" (unrelated to) its management).  Thus, any substantial

transaction involving an SBIC, its portfolio holdings, and other insider persons or entities, must be pre-approved by the SBA with full disclosure of the insider relationships.

### 2. Certifications of Compliance.

31.     SBIC licensees are required to file a variety of annual, quarterly, and periodic forms and reports with the SBA. *See, e.g.,* 13 C.F.R. §§ 107.630–650 (Annual Financial Reports on Form 468; portfolio financing reports; portfolio valuations); 107.1220 (quarterly financial statements). These filings include certifications of truthfulness and of compliance with SBA regulations. False statements and material omissions are a violation of the Small Business Investment Act. *Id.* § 107.507. For example, as a "material inducement" for the SBA to issue its license and provide financial assistance, every SBIC is required to accurately identify each of its individual and institutional investors, disclosing whether they directly or indirectly own or control 10% or more of the SBIC, and whether they are "Associates" (*i.e.* insiders) within the meaning of 13 C.F.R. 107.50 by virtue of their affiliation with other investors or management role in, or ownership or control of, an entity owning or controlling 10% or more of a portfolio company. The SBIC is required to notify the SBA "promptly" of any changes in this information.

32.     All of these required SBA filings include certifications by an officer or manager of the SBIC that the information therein is true and correct in all respects. These certifications are made under penalty of perjury pursuant to 18 U.S.C §§ 1001 and 1006, which criminalize any false statement or material omission made to the SBA, and prohibit sharing in any benefit obtained through an SBIC with an intent to defraud. In addition, 15 U.S.C. § 645(a) makes it a

criminal offense to make any false statement to the SBA for the purpose of obtaining money or anything of value or influencing SBA action in any way.

33.     It is well established that false statements or omissions made in connection with participation in SBA programs can give rise to a violation of the False Claims Act. *See, e.g., Ab-Tech Construction, Inc. v. U.S.*, No. 298-89-C, 31 Fed. Cl. 429, 1994 U.S. Claim LEXIS 193 (U.S. Fed. Claims Ct. June 2, 1994) (subcontractor participating in SBA program for minority-owned businesses violated FCA by falsely certifying its compliance with program rules and concealing fact that it was actually controlled by ineligible non-minority contractor); *U.S. v. Torkelsen*, Civ. No. 06-05674, 2007 U.S. Dist. LEXIS 88955, at *18 (E.D. Pa. Dec. 3, 2007) (defendants violated FCA by falsely certifying compliance with SBIC regulations on insider transactions).

### 3.     Receivership and Recovery from Troubled SBICs.

34.     The SBA is entitled to a return on the public money it has invested in an SBIC, and it is empowered to take steps to safeguard that investment. For example, if an SBIC's "Capital Impairment" (the ratio of its losses to its private capital commitments) exceeds a certain threshold, the SBA can "foreclose" on the SBIC by bringing a judicial action for receivership, taking over its management, and liquidating its holdings. *See* 13 C.F.R. § 107.1830. In a receivership proceeding, the SBA's claims to any proceeds from the sale of portfolio holdings have priority over the claims of the private investors, who cannot be repaid until the SBA has fully recovered its investment. Furthermore, when an SBIC has suffered losses as a result of improper self-dealing or other violations of SBA regulations, its principal owners, officers, and

directors can be held personally liable for the losses resulting from those violations. *See SBA v. Segal*, 383 F. Supp. 198, 202–03 (D. Conn. 1974).

## VI.   DEFENDANTS' SELF-DEALING SCHEME TO DEFRAUD THE SBA.

35.    Between 2009 and 2013, Defendants engaged in a far-reaching scheme to enrich themselves at the expense of the SBA and the taxpayer by using their control over the Greentree SBIC to divert its resources toward failing companies in which Defendants were heavily invested through their separate, private funds. Greentree lost substantially all of its investment in these companies. At the same time, Defendants contrived to seize control of Greentree's only successful portfolio company, STOP, by preventing Greentree from investing its own funds in STOP and by sabotaging STOP's attempts to obtain funding from outside investors, thereby artificially depressing STOP's value so that they could acquire it in an insider transaction at a bargain price and then turn around and sell it for substantial profit. Defendants' mismanagement drove Greentree into financial collapse and receivership, causing a loss to the SBA of about $93 million of the $98 million it had invested in Greentree and its portfolio companies.

### A.    The Greentree SBIC and its Holdings.

36.    Defendant JHW Greentree Capital L.P. ("Greentree") was organized in 2004 as a Small Business Investment Company ("SBIC") under the provisions of the SBIA, and was licensed by the SBA on September 29, 2004.

37.    Defendants Peter M. Castleman, Michael R. Stone, and Daniel J. O'Brien were the Principals of Greentree's General Partner, JHW Greentree Capital GP, LLC. Castleman and Stone had the final say on Greentree's investment decisions. O'Brien was designated as the Managing Member of Greentree's General Partner, JHW Greentree Capital GP, LLC, and was

formally responsible for Greentree's compliance with SBA regulations. At the same time that they acted as Principals of Greentree, Castleman and Stone continued to serve as Managing Partners for their investment company, Defendant J.H. Whitney & Co., one of the main private investors in the Greentree portfolio companies. From the outset, Castleman and Stone represented to the SBA and to investors that Greentree was an integral part of Whitney's private investment offerings, and that the SBIC would be backed by the resources and expertise of Whitney and its leadership. As Castleman put it in an August 24, 2004 letter to the SBA's Director of Licensing, "To us, Greentree is Whitney and Whitney is Greentree."

38.     Relator Michael Cowan, along with Sam Shimer and Robert Chartener, were hired in 2004 as three full-time managers for Greentree's day-to-day operations. Relator Cowan prepared Greentree's financial reports, which were reviewed and signed by Defendant O'Brien in his capacity as Managing Member of Greentree's General Partner.

39.     As a licensed SBIC, Greentree was required to submit various annual, quarterly, and other reports to the SBA, all of which contained certifications of ongoing compliance with SBA regulations. Relator Cowan acted as Greentree's liaison to the SBA and prepared the reports; Defendant O'Brien reviewed and signed the certifications as Greentree's Managing Member. Each of these certifications, signed under penalty of perjury, included statements that the information contained in Greentree's reports to the SBA was true and correct in all respects.

40.     Greentree obtained about $168 million in total financing, of which about $98 million came from the SBA and about $70 million came from various private investors. The SBA provided this funding to Greentree in the form of "Participating Securities," which were to be repaid after ten years. In exchange, the SBA received a preferred limited partnership interest

in Greentree, which entitled it to priority over the other private investors in any distribution of profits or proceeds from the businesses in which Greentree invested.

41.    Greentree used its financing to acquire a portfolio of holdings in fourteen different small businesses.    In four of these portfolio holdings (American Property Hospitality Management, EMS Holdings, Tactronics, and Universal Building Products) Greentree "co-invested" its funds alongside investments from other, much larger non-SBIC private funds controlled by Castleman and Stone through their investment company, Defendant J.H. Whitney & Co.  These four co-invested holdings were considered "Associates" under SBA regulations because they were owned or controlled in substantial part by private funds under the control of Greentree's own managing principals. *See* 13 C.F.R. § 107.50.  Accordingly, any Greentree transactions involving the co-invested holdings were treated as "insider" transactions which generally required advance disclosure to, and/or approval from, the SBA. *See id.* § 107.730.  As managing principals of a licensed SBIC, Defendants Castleman, Stone, and O'Brien had a duty not to advance the interests of their separate private investments at the expense of the interests of Greentree and the SBA's investment in Greentree.

42.    Another of the businesses in Greentree's portfolio was STOP, which makes GPS monitoring devices, including ankle bracelets, for parolees, probationers, registered sex offenders, and other persons under law enforcement supervision.  STOP has major contracts with the California Department of Corrections and various other state and local law enforcement agencies.  At all relevant times, Defendant Steven Logan was STOP's Chief Executive Officer.

43.    Greentree initially invested about $17 million in STOP, of which about $12 million was the SBA's money.  From 2004 up through the end of 2009, Greentree owned

approximately 60% of the equity in STOP and controlled the company with six of the eight seats on STOP's board of directors. The remainder of STOP's equity was owned or controlled by Defendants Prairie Fire Capital, Ptolemy Capital, and GarMark, and also by certain of STOP's management, including Defendant Logan. On information and belief, Defendants Castleman, Stone, and Bewkes invested substantial amounts of their own money in STOP through the vehicles of the Prairie Fire, Ptolemy, and GarMark entities which they controlled, and thus they held a substantial interest in STOP separate and apart from Greentree's interest. Because of Castleman and Stone's private co-investments, STOP was considered an "Associate" under SBA regulations because more than 10% of it was owned by private funds under the control of Greentree's own managing principals. *See* 13 C.F.R. § 107.50. Accordingly, any Greentree transactions involving STOP were treated as "insider" transactions which generally required advance disclosure to, and/or approval from, the SBA. *See id.* § 107.730. As managing principals of a licensed SBIC, Defendants Castleman and Stone had a duty not to advance the interests of their separate private investments in STOP at the expense of Greentree's and the SBA's investment in STOP.

44.    In addition to its equity holding in STOP, GarMark was also a major creditor of STOP. In June 2006, GarMark advanced STOP about $5 million in financing at an interest rate of 12%. On information and belief, Castleman and Stone owned one third of this obligation, which was scheduled to come due in June 2011. The GarMark loan included a lien on all of STOP's assets, which effectively precluded STOP from seeking further secured financing from banks. On information and belief, Defendant GarMark is owned and/or controlled by Defendant Bewkes, who on information and belief is a close personal friend of Defendant Castleman. On

information and belief, Defendants Castleman and Stone have substantial funds invested in GarMark.

### B.    Defendants' Self-Dealing Scheme.

45.     During the economic downturn in 2008–2009, most of Greentree's fourteen portfolio companies performed poorly. By the beginning of 2009, with the sole exception of STOP, Greentree's holdings were now worth less (in some cases as much as 75% less) than what Greentree had paid to acquire them. As of 2009, Greentree still owed the SBA about $93 million on its original $98 million investment. STOP's business, by contrast, was flourishing as it won a series of law enforcement and correctional contracts. Among Greentree's holdings, only STOP had a valuation that exceeded the cost basis of Greentree's investment.

46.     On information and belief, by the end of 2008 Defendants Castleman, Stone, and O'Brien had concluded they were not going to make money through Greentree. Greentree's partnership agreement designated the SBA as a preferred limited partner and gave it priority over the private investors in any distributions of profits or proceeds, as required by SBA regulations. *See* 13 CFR §§ 170.1500–1540. So long as STOP remained within the SBIC, whatever profits it generated for Greentree would be swallowed up by the much larger obligation to the SBA that resulted from the poor performance of the rest of Greentree's portfolio. Accordingly, the Defendants contrived a scheme to strip away Greentree's few promising holdings so as to avoid sharing any profits with the SBA.

47.     On information and belief, Defendants Castleman, Stone, and O'Brien deliberately starved Greentree of the resources it needed to manage its portfolio holdings efficiently. At the end of 2008, ostensibly in an effort to cut costs, Castleman laid off two of

Greentree's three managers, Shimer and Chartener, and left Relator Cowan as the only full-time manager during 2009. Meanwhile, Defendants continued to bill Greentree for lavish expenses such as Stone's California office and fees for Castleman's private jet. At the end of 2009, Relator Cowan was also removed from full-time management, and Defendant O'Brien took over his responsibilities on a part-time basis. Ultimately, however, Greentree's operations and numerous holdings were too big for one person to manage effectively.

48.    The removal of Greentree's experienced full-time managers had a very detrimental effect on Greentree's performance in 2009 and after. The managers had supervised and closely observed the performance of Greentree's holdings by maintaining day-to-day contact with the CEOs and serving actively on the boards of the various portfolio companies. On information and belief, after the managers were gone, communication between Greentree and its portfolio companies languished and the CEOs would hear from O'Brien only once every few months.

49.    Greentree never informed the SBA that it was getting rid of its full-time managers.

50.    If Greentree had continued under competent full-time managers who were not affected by conflicts of interest, there is every likelihood that Greentree could have avoided financial collapse and receivership and the SBA's investment could have been repaid.

### 1.    Defendants Divert Greentree's Funds To Support Their Separate Private Investments in Failing Companies.

51.    On information and belief, Castleman, Stone, and O'Brien conspired to steer Greentree's capital away from STOP, its only profitable holding, and into the four other companies in which private Whitney Group funds controlled by Castleman and Stone had co-

invested. On information and belief, Defendants' aim in doing so was twofold: first, to use Greentree's (and the SBA's) capital to help rescue the much larger private investments they had already made in those struggling companies; and second, to deprive STOP of the investment capital it needed to expand, with the aim of artificially depressing its value so that their private funds could acquire it from Greentree at a bargain-basement price.

52.    Of the $20 million that Greentree invested in its fourteen portfolio companies during 2009, $11 million went to the four companies in which Castleman and Stone privately owned or controlled majority interests. These four companies were doing particularly badly in 2009, and favoring them over STOP made no business or economic sense for Greentree:

a.    Tactronics was a military contractor manufacturing ballistic armor and specialized communications equipment. Greentree had co-invested in Tactronics alongside Castleman's Whitney VI fund, holding 15.4% to Whitney VI's 76.2%. Greentree's only representative on Tactronics' board was Defendant Castleman, and the Whitney fund kept Greentree in the dark about its management of Tactronics and the details of its financing arrangements. During 2009, Greentree invested an additional $3.1 million in Tactronics, which by 2010 was already written down to 25% of what Greentree had originally paid for it. In an August 26, 2009 e-mail, Relator Cowan warned Defendant O'Brien that given the lopsided investment ratio and the poor performance to date of this and other co-invested companies, Greentree was "at [Whitney's] mercy" and Whitney "may seek to squash Greentree down the road." In 2011, this prediction

came true when Defendants contrived through a fraudulent conveyance to wipe out Greentree's equity in Tactronics' successful ballistic armor line of business (Armorstruxx) by spinning it off into a new separate company, Advanced Defense Holdings, formed through a series of complicated transactions. The communications line of business, in which Greentree remained invested, failed and closed its doors in 2011. Greentree lost substantially all of the $12.4 million it had invested in Tactronics. Meanwhile, on information and belief, Armorstruxx is a thriving business currently owned by Castleman's Whitney VI fund. On information and belief, Greentree's equity in Armorstruxx was worth between $8 million and $10 million at the time that Defendants fraudulently conveyed it to Whitney VI. These transactions should have been reported to the SBA, due to the insider relationships between Castleman, the Whitney fund, Tactronics, Advance Defense Holdings, and Armorstruxx, but no such report was made.

b. Universal Building Products ("UBP") was a provider of construction material and products. Greentree had co-invested in UBP alongside Castleman's Whitney V fund, with Greentree holding 11.9% next to Whitney V's 69.1%. When Greentree added $3.1 million to its investment in 2009, UBP was already struggling and had been written down to 20% of invested cost; by 2010 it was in bankruptcy. On information and belief,

Greentree lost substantially all of its approximately $10 million total investment in UBP.

c. Eastern Mountain Sports Holdings ("EMS") was a manufacturer of sporting goods. Greentree had co-invested in EMS alongside Castleman's Whitney V fund, holding 22.5% next to the Whitney fund's 68.6%. By 2009, when Greentree added $2.5 million to its existing investment, EMS had already been written down to half what Greentree had originally paid for it. Eventually it was sold at a complete loss with no distribution of proceeds to the SBA or other investors. On information and belief, Greentree lost about $12.5 million it had invested in EMS.

d. American Property Hospitality Management ("APHM") was an operator of various resort hotel properties. Greentree had co-invested in APHM alongside Castleman's Whitney V and Whitney VI funds, with Greentree controlling only 6.2% next to the Whitney funds' 93.8%. As of 2009, when Greentree invested an additional $2 million, Greentree's investment in APHM had already been written down to only 25% of the $11.3 million Greentree had originally paid for it, and Greentree should have walked away from it rather than investing more money. On information and belief, Greentree's entire investment in APHM was written off by 2011.

53.    These four troubled companies had received $57 million out of Greentree's $147 million total investment capital as of 2009. Castleman and Stone privately owned larger stakes in these companies through the Whitney funds, and they put the interests of their private

investments ahead of the interests of Greentree and the SBA. In doing so, they violated the Small Business Investment Act and the SBA's regulatory prohibitions on self-dealing and conflicts of interest. *See* 15 U.S.C § 687; 13 C.F.R. § 107.730. By failing to disclose and seek SBA approval for their insider transactions, Defendants not only violated the SBIA and related regulations, *see* 15 U.S.C. § 687a, 13 C.F.R. § 107.507, but also caused Greentree to violate the False Claims Act by causing Greentree's reports to the SBA to be incomplete and materially misleading and its certifications of compliance with SBA regulations to be false. On information and belief, Defendants' purpose in so doing was to avoid or reduce Greentree's obligation to repay the approximately $93 million remaining of the government funds it had received from the SBA.

54.    By steering the bulk of Greentree's available investment capital toward other failing companies in which Castleman and Stone had already heavily committed their private funds, Defendants prevented Greentree from being able to provide the additional investment capital needed to finance the further expansion of STOP, Greentree's only successful holding. At the same time, on information and belief, throughout 2009 Defendants Castleman, Stone, and O'Brien worked together with Defendants GarMark and Bewkes to frustrate STOP's efforts to obtain investment capital from outside sources, so that they could take over control of STOP in an insider transaction on terms highly favorable to themselves and highly unfavorable to Greentree.

### 2.    Defendants Hijack Investment Opportunities Away From Greentree.

55.    Defendants also used their control of Greentree and their insider connections to improperly divert and usurp promising investment opportunities that Greentree had developed

through lengthy and painstaking due diligence. One of Greentree's portfolio companies, RPET Holdings LLC (d/b/a New Horizons Plastics Recycling), was a startup company that specialized in recycling PET plastic from soft drink bottles. Greentree's investment in RPET totaled about $19 million. On information and belief, the CEO of RPET, Robert Fotsch, was an old business school classmate of Castleman and had been the CEO of another Whitney company.

56.     In 2008, RPET had the opportunity to acquire a bankrupt competitor, Wellman Plastic Recycling ("Wellman") for pennies on the dollar. This acquisition would have made good business sense for RPET. Because Greentree did not have enough money to complete the acquisition by itself, it teamed up with Castleman's Whitney VI fund. The participation of Whitney – an "insider" controlled by Greentree's management – would have required Greentree to seek the SBA's approval for its planned acquisition of Wellman.

57.     However, on information and belief, after Greentree's due diligence was concluded, Castleman and Fotsch decided not to merge Wellman into RPET and not to make any further investment from Greentree. Instead, the Whitney VI fund acquired Wellman for itself, kept Wellman in business and operated it as a direct competitor to Greentree's RPET, and installed Fotsch as Wellman's CEO at the same time that he was still serving as CEO to RPET.

58.     In 2010, RPET failed and Greentree's entire $19 million investment was wiped out. On information and belief, Wellman is still in business and still owned by Whitney VI, and is currently valued at more than twice what Whitney VI paid for it.

59.     By taking the Wellman opportunity away from Greentree and diverting it to his own private fund, and by poaching away RPET's CEO and setting up Wellman as a direct

competitor to the SBIC's investment in RPET, Defendant Castleman violated his duties to Greentree and to the SBA.

### 3.   Defendants Sabotage STOP's Efforts To Attract Outside Investment.

60.    As discussed above, STOP was the only successful business of the fourteen businesses in Greentree's investment portfolio in the wake of the economic downturn.  To take full advantage of its business success, support its expansion, and compete for new government contracts, STOP needed to raise about $2 to $3 million in new investment capital over the next 2 to 3 years.  In addition, STOP needed to pay off or refinance the $5 million debt it owed to GarMark, which was scheduled to come due in 2011.  On information and belief, one-third of this debt was owned by Defendants Castleman and Stone.  During the spring of 2009, STOP engaged Sam Shimer (formerly one of Greentree's managers) as a consultant to coordinate its efforts to raise up to $10 million in new outside capital.

61.    Outside investors recognized STOP's potential and were interested.  During the summer and fall of 2009 one such outsider, Webster Capital, engaged in lengthy negotiations with Greentree.  Webster presented an offer under which it would invest about $10 million in STOP, acquire between 10–20% of STOP's equity from Greentree at a price of about $2 per share, and take over one of the eight seats on STOP's board of directors. The Webster proposal, had it been consummated, would have provided more than sufficient capital to meet STOP's expansion needs and wipe out its debt to GarMark, and would still have left Greentree with majority control of STOP's board.

62.    On information and belief, the Webster deal never came to pass, however, because Defendant Castleman -- who had the final say in Greentree's investment decisions --

repeatedly stalled and delayed Greentree's responses to Webster, sent Shimer back to Webster to negotiate new terms and then rejected those terms, and ultimately caused Greentree to reject Webster's offer.

63.     Castleman similarly stalled and frustrated STOP's efforts to attract other outside investors, at least one of whom participated in due diligence during the summer and fall of 2009 but ultimately lost interest and walked away.

64.     On information and belief, Defendants Castleman, Stone, and Bewkes also used STOP's existing $5 million debt to GarMark – one-third of which was owned by Castleman and Stone – to create a stumbling block for potential new investors.  During 2009, GarMark aggressively pushed STOP to refinance this debt even though it would not come due until June 2011.  GarMark's existing lien on all of STOP's assets prevented STOP from obtaining additional secured funding from banks, and was a source of concern to other potential investors. On information and belief, GarMark initially showed a willingness to relax its loan terms so as to make it easier for STOP to obtain outside funding, but then changed its tune and took a more inflexible stance under pressure from Castleman.

65.     Defendants Castleman and Stone also prevented Greentree itself from investing more of its own capital in STOP, which would have frustrated their plans to take over STOP for the benefit of their own private funds.  Greentree had sufficient funds to put about $2 or $3 million more into STOP, which would have been enough to satisfy STOP's immediate and long-term needs for business capital.  In late 2009, Greentree had about 24% of its Regulatory Capital (*i.e.* capital committed or contributed by private investors) invested in STOP.  Because SBA approval is required for an SBIC to invest more than 20% of its Regulatory Capital in a single

business, Greentree would have had to make an "overline" request to the SBA before investing the additional funds in STOP.  During the fall of 2009, Relator Cowan and Shimer discussed the option of an overline investment with Castleman.  On information and belief, the SBA would probably have approved an overline request up to 30% of Regulatory Capital, which would have allowed Greentree to invest another $4.4 million in STOP.  However, Castleman prevented Greentree from submitting an overline application, and prevented Greentree from investing any additional funds in STOP.

### 4.    Defendants Take Control of STOP and Disregard SBA Regulations.

66.    After having driven away outside investors and closed off all of STOP's alternatives for obtaining the funding it needed, Defendants presented their own financing offer through the intermediary of the Castleman-controlled Westwind Investors group.  In December 2009, Westwind made an offer on terms decidedly less favorable than those of the Webster deal that Castleman had rejected only months earlier.  Westwind would buy $3 million of STOP's equity at a price of about $1.75 a share (where Webster had offered $2 a share), and would take two of STOP's eight board seats (where Webster would have taken only one).  In addition, Westwind proposed to replace the existing $5 million GarMark loan at its 12% interest rate – one third of which, on information and belief, was owned by Defendants Castleman and Stone –with a new $7 million loan at an interest rate of 16%.  STOP's board agreed to these terms, executed a letter of intent, and proceeded with due diligence.

67.    Between the initial Westwind proposal in December 2009 and the final closing of the deal on March 12, 2010, the terms became even less favorable to Greentree and STOP and even more lucrative for Castleman and his colleagues.  In the final deal, Castleman's group spent

about $4 million to buy the same equity in STOP that Webster had offered to buy for $10 million, at a price of about $1 per share. The final March 2010 deal included terms such as a "liquidation preference floor" that guaranteed Defendants a return of at least two times their investment (and potentially up to six times their investment, depending on whether STOP met various arbitrary performance targets) – and Defendants were guaranteed to be paid this return *ahead* of existing investors like Greentree and the SBA. Greentree should never have agreed to terms that were so unfavorable to existing shareholders, and, on information and belief, it did so only because it was effectively controlled by Defendants.

68.     In the final March 2010 deal, the existing GarMark loan of $5 million at 12% – which would not have been due until June 2011 – was replaced with a new loan of $6 million at 16%, now with significant prepayment penalties which would make it more difficult for STOP to pursue any future refinancing. On information and belief, STOP could easily have obtained financing from outside sources on significantly less onerous terms. The final deal also included a "poison pill" provision giving Castleman's group a right of first refusal on any attempt by Greentree to sell its remaining equity in STOP. The right of first refusal had the effect of making it more difficult for STOP to attract potential outside buyers, who would be less likely to go through the effort of a due diligence process.

69.     Castleman's group also took over effective control of STOP, claiming five of the eight seats on its board of directors. Greentree's representation on STOP's board fell from six seats to only one seat, even though it continued to own about 46% of the equity in STOP (down from its previous ownership share of 61.6%). Because Greentree was controlled by Castleman,

Stone, and O'Brien, it acquiesced in these unfavorable terms and did not protest its loss of majority control over STOP.

70.   The March 2010 transaction, in which Greentree relinquished corporate control over STOP to private funds controlled by its own principals and managers, was an insider transaction that required disclosure to and approval from the SBA. *See, e.g.*, 13 C.F.R. § 107.730.  However, Defendants did not seek the SBA's approval or even inform it of the insider nature of the transaction.  On information and belief, if the SBA had been fully apprised of the relationships between the parties and the change in corporate control, it would not have allowed the transaction to take place.

71.   In addition, the extravagant 16% interest rate on STOP's refinanced debt violated another SBA regulation, which limited permissible interest rates on similar financing arrangements to a maximum of 14%. *See* 13 C.F.R. § 107.855.  Defendants were required to seek the SBA's approval for the higher interest rate, but they did not do so.  On information and belief, the SBA would not have approved the transaction if it had known about the excess interest rate.

72.   The SBA's regulations contain a "safe harbor" that allows an SBIC to engage in "insider" transactions without seeking advance approval from the SBA, so long as the SBIC participates in the transaction at the same time and under the same terms and conditions as the other participants. *See* 13 C.F.R. § 107.730.  The purpose of this rule is to maintain the SBIC's same proportionate ownership share in the portfolio company under the same terms by which it had obtained its original investment.  If a transaction involving insiders does not change the SBIC's proportionate ownership share, and does not change the terms under which the SBIC had

originally invested, then no actual harm has resulted from the conflict of interest and there is no need to obtain the SBA's approval. *See id.*

73.     As stated above, Greentree could have invested a substantial sum of between $2 and $3 million in STOP, and would thus have satisfied the "safe harbor" requirement. However, Defendants did not want Greentree to make a large new investment in STOP, because they wanted to divert Greentree's available funds into the other struggling companies in which they had co-invested – and also because they wanted to reduce, not increase, Greentree's equity in STOP so that they could take over that company for themselves. Accordingly, Defendants attempted to evade the requirement for SBA notification and approval by causing Greentree to invest only the trivial sum of $120,000 in the STOP deal. Defendants knew that Greentree's $120,000 contribution to the $10 million package was a mere smokescreen, being far too small to meet the "same proportion" requirement of the safe harbor rule.

74.     As a result of Greentree's minimal participation in the March 2010 transaction orchestrated by its managers and principals, Greentree's equity interest in STOP fell from 61.6% to 46%, Greentree gave up five of its six board seats, and Greentree surrendered majority control over STOP to Defendants – exactly the outcome the SBA's "same time, same conditions" requirement is intended to prevent. *See* 13 C.F.R. § 107.730. On information and belief, if Greentree had fully participated in the March 2010 transaction and co-invested between $2 and $3 million under the same terms and conditions as Defendants – thus complying with § 107.730's safe harbor requirement – then the additional equity thus acquired would have sold for between $10 and $11 million (returning a net gain of between $8 and $9 million) when Defendants sold STOP on the market in December 2013.

75.     In Greentree's subsequent filings with the SBA, Defendants disclosed to the SBA only that Greentree had made a $120,000 co-investment in the March 2010 STOP deal.  This disclosure was incomplete and misleading, because Defendants did not disclose to the SBA that the other participants in the STOP transaction – who received the lion's share of its benefits – were affiliated investors and "insiders" within the meaning of SBA regulations.

**C.     Relator Michael Cowan Warns Defendants About SBA Regulatory Violations.**

76.     Relator Michael Cowan is an accomplished private equity professional with 20 years' experience in acquiring, financing, developing, and reorganizing businesses in a variety of industries.  In 1996, Relator Cowan was recruited by Defendant Michael Stone to serve as Chief Financial Officer for Heartland Pork Enterprises, a Whitney-owned company.  During Relator Cowan's tenure, Heartland grew from $15 million in revenue to over $175 million, and from 40 employees to over 600 personnel.  From 2000 to 2003, Relator Cowan was a Principal at J.H. Whitney & Co. and served as CFO for about 20 different Whitney funds that collectively held over $5 billion in assets.

77.     In 2003, Defendant Stone invited Relator Cowan to participate in the formation of Greentree as a licensed SBIC.  Relator Cowan joined Greentree in August 2003, and managed the SBA application and licensing process.   Up through 2009, Relator Cowan handled Greentree's relationship with the SBA, acted as Greentree's point of contact for the agency, and prepared the annual, quarterly, and other reports that Greentree was required to submit to the SBA.  Defendant O'Brien reviewed and signed the reports in his capacity as Managing Member of Greentree's General Partner, JHW Greentree Capital GP, LLC.

78.    Relator Cowan regularly advised Greentree's Principals, including Defendants Castleman and O'Brien, on matters relating to Greentree's compliance with SBA regulations. In addition, during 2009 Relator Cowan became solely responsible for running Greentree's day-to-day operations after Castleman had laid off the other two managers, Shimer and Chartener, at the end of 2008. At several points during 2009, Relator Cowan complained to Castleman that he was being given insufficient resources to properly manage Greentree's affairs and that its investments would suffer as a result. On information and belief, Defendant Castleman grew increasingly hostile toward Relator Cowan as a result of these complaints, and also because Relator Cowan's advice on compliance with SBA regulations conflicted with Castleman's plans to take control of STOP at Greentree's expense. At the end of 2009, Castleman eliminated Relator Cowan's position as a full-time manager. However, Relator Cowan continued to work with Greentree and with Defendant O'Brien on a consultant basis, and continued to advise them on matters relating to SBA compliance, through April 2010.

79.    On multiple occasions in 2009, Relator Cowan warned Castleman, Stone, and O'Brien both verbally and in writing that they were not acting in the best interests of Greentree or of the SBA.

80.    For example, in a January 24, 2009 e-mail, when Peter Castleman suggested that Greentree set up a sham transaction to erase the private partners' potential liabilities to the SBA by "calling" their unfunded capital commitments and then distributing the same money back to them as cash, Relator Cowan warned Defendant O'Brien that the plan "would stick out like a sore thumb that we were trying to game the system."

81.     In an August 26, 2009 e-mail, Relator Cowan warned Defendant O'Brien that Greentree had too much of its capital co-invested in poorly-performing companies where it was a minority investor alongside the much larger Whitney funds controlled by Castleman and Stone, leaving Greentree without sufficient resources for its own standalone deals.   Relator Cowan warned that the Whitney funds "may seek to squash Greentree down the road" and squeeze it out of its positions in the co-invested companies.

82.     On several occasions during late 2009 and early 2010, both verbally and in writing, Relator Cowan repeatedly warned Defendants Castleman and O'Brien that the terms of the STOP deal violated SBA regulations in multiple respects.

83.     For example, after Relator Cowan explained that any participation by Greentree in an insider transaction would need to meet the "same time / same conditions" test in order to qualify for the safe harbor and avoid the need for SBA approval under 13 C.F.R. § 107.730, Defendant O'Brien said that Greentree would not be able to invest more than $200,000 in the STOP transaction.   Relator Cowan advised Defendants that this sum would be nowhere near enough to avoid the requirement for disclosure to the SBA, telling Defendant O'Brien that this arrangement "would not fool" the SBA and that it was "smoke and mirrors."   Willfully disregarding Relator Cowan's advice, Defendants caused Greentree to contribute only $120,000 to the final STOP deal and did not inform the SBA of the insider nature of the transaction.

84.     In an April 8, 2010 e-mail exchange, Relator Cowan warned Defendant O'Brien that the 16% interest rate on the new loan to STOP exceeded the 14% maximum rate allowed under 13 C.F.R. § 107.730, and advised O'Brien that Greentree would probably need to reduce the interest rate in order to obtain SBA approval.  In response, O'Brien – Greentree's Principal

and Managing Member – said: "*I know in the mind of the SBA rules are rules, but it seems crazy to just give away economics other co-investors are enjoying.*" Willfully disregarding Relator Cowan's advice, Defendants did not inform the SBA of the excess interest rate, and did not reduce the rate in order to bring the loan in compliance.

85.    After April 2010, Defendants ended Greentree's consultant relationship with Relator Cowan, and no longer sought his advice on matters relating to compliance with SBA regulations.

### D.    Defendants Manipulate Greentree's Receivership to Acquire STOP for a Fraction of its Value.

86.    On information and belief, Defendants – having concluded that they could not make money within the framework of the Greentree SBIC and its obligations to the SBA – conspired to drive Greentree into financial collapse and receivership so that they could acquire its only successful holding, STOP, at a bargain-basement discount. Their plan succeeded.

#### 1.    Defendants Drive Greentree into Receivership.

87.    By the beginning of 2012, Greentree's "Capital Impairment" – the ratio between its realized and unrealized losses and its private capital commitments – had reached and then exceeded a regulatory threshold that put Greentree in default of its obligations to the SBA and triggered the SBA's authority to foreclose on Greentree's holdings by initiating a receivership process. *See* 13 C.F.R. §§ 107.1820–1840. At the beginning of 2012, Greentree still owed the SBA about $93 million of the SBA's original $98 million investment.

88.    In January 2012, after Greentree failed to cure its capital impairment despite multiple warnings, the SBA initiated receivership proceedings against Greentree in federal court. By consent order, the SBA was appointed as Receiver for the purpose of marshaling and

liquidating Greentree's assets.  The SBA's Receiver took over the management of Greentree, moved its headquarters to an SBA office in Washington, D.C., and began the process of selling off Greentree's holdings.

89.    Greentree's capital impairment and subsequent receivership, on information and belief, was caused in substantial part by the acts and omissions of Defendants Castleman, Stone, and O'Brien in placing the interests of their separate private investments ahead of Greentree's interests.

### 2.    Defendants Deceive the Receiver.

90.    In contrast to the poor performance of Greentree's other portfolio companies, STOP was in good financial shape at the time Greentree went into receivership.  In late 2011, Greentree's interest in STOP was valued at $28.2 million, or about $1.76 per share.   On information and belief, STOP's revenues continued to trend upward throughout 2012, and it continued to win significant government contracts.

91.    In order to fulfill their goal of acquiring Greentree's remaining equity in STOP, Defendants needed to convince the SBA's Receiver to sell off Greentree's holding in STOP for a price substantially lower than its true value.  To this end, Defendants conspired to present a skewed appraisal report to the Receiver which purported to support an artificially low value for STOP. On information and belief, STOP hired and paid the appraiser, who relied on information supplied by Greentree's Principals and by Logan without any independent investigation.  The SBA's Receiver, in turn, relied on the appraiser's report and accepted its artificially low valuation for STOP.

92.    Defendants also conspired to prevent the Receiver from seeking out any other potential buyers who might be willing to submit higher bids for STOP.  Defendant Steven Logan, STOP's CEO, advised the Receiver not to undertake a due diligence process for STOP because publicity that STOP was being offered for sale might hurt its prospects for winning certain government contracts and thus depress its value.  The Receiver followed Logan's advice, and sold Greentree's remaining interest in STOP to Defendants without undertaking any due diligence process and without making any effort to identify other potential buyers.

93.    Defendant Logan's statement to the Receiver that a due diligence process would be harmful to STOP's value was a false statement, as evidenced by the much higher offers STOP was able to obtain from multiple bidders when it did undertake a comprehensive sale and due diligence process just months later.   On information and belief, Logan was working at Castleman's direction to deceive the Receiver into approving the sale of STOP at a bargain price. Given Castleman's majority control of STOP's board, Logan's continued employment as STOP's CEO depended on maintaining a good relationship with Castleman.  Logan, who owned a minority stake in STOP, also stood to gain financially from Castleman's planned acquisition and re-sale of the company.

94.    By presenting to the Receiver a contrived appraisal report stating a misleadingly low valuation for STOP, and by advising the Receiver that a due diligence process would be harmful to STOP, Defendants made knowingly false and misleading statements to the SBA's Receiver, who was an agent of the United States government.  Their purpose in so doing was to influence the Receiver to dispose of Greentree's and the SBA's interest in STOP at a price far

lower than its true market value, and thus to improperly avoid or decrease their obligation to repay the money Greentree owed to the SBA out of the proceeds of any sale of STOP.

### 3.   Defendants Acquire Greentree's Remaining Interest in STOP.

95.   As of 2012, Greentree still owned about 46% of STOP's equity.  Defendants presented a proposal to the Receiver to buy out all of this equity for the extremely low price of $3.25 million, or about 20 cents a share, a price far lower than the $2 per share that the Webster Group had offered in 2009, lower than the $1.76 per share at which Greentree had valued its interest in late 2011, and lower even than the $1 per share that Castleman's group had paid in the insider deal that gave them control of STOP in March 2010.  On information and belief, Defendants' proposed price was completely at odds both with Greentree's own accounting, which had valued its interest in STOP at $28.2 million as of late 2011, and also with STOP's financial reports, which showed the company's earnings rising on a year-over-year basis.

96.   Influenced by a skewed appraisal report and by misleading advice from Logan, and in the absence of any offers from other potential buyers, the Receiver accepted the terms of Defendants' offer, and the transaction closed on November 19, 2012.

97.   As a result of the November 2012 sale, substantially all of STOP's equity was now owned by a group of entities and investment vehicles which, on information and belief, were directly or indirectly controlled by Defendants Castleman, Stone, and Bewkes.  These entities included Defendants GarMark Partners II, Prairie Fire Capital, Ptolemy Capital, the Castleman Family Foundation, and the Michael and Karen Stone Family Foundation.

98.   The SBA, which was still owed about $93 million out of the $98 million it had originally invested in Greentree, had priority in the receivership process over the claims of

private investors. Any proceeds from the sell-off of STOP or other Greentree holdings would be applied first to pay down Greentree's obligation to the SBA. In fact, the SBA recouped only $3.25 million on the proceeds of its November 2012 sale of STOP, out of the $12 million the SBA had originally contributed to Greentree's initial investment in STOP.

99.    On information and belief, if the Receiver had directed Greentree to undertake a proper due diligence for STOP during 2012, Greentree could have located outside buyers and sold its interest in STOP in an arm's length market transaction for considerably more than it actually did, and Greentree could have used the proceeds of such a sale to satisfy considerably more of its obligation to the SBA than it actually did. As a result of Defendants' false statements to the Receiver and their manipulation of the receivership process, the SBA suffered an economic loss on STOP alone that can be measured the difference between the $3.25 million it actually obtained for STOP in the receivership sale, and the amount it could have obtained in an arm's length market transaction following an appropriate due diligence process. This loss was separate and apart from the loss Greentree and the SBA had already incurred as a result of the insider deal by which Defendants had taken over majority control of STOP in March 2010.

E.    **Defendants Sell STOP for a Massive Profit; the SBA Gets Nothing.**

100.    In 2013, Defendants completed their scheme by selling STOP in a market transaction for a price *eighteen times* what they had paid the SBA for it only a year earlier. Having successfully employed a strategy of improper self-dealing and deception to force STOP's value downward so that they could buy it as cheaply as possible, Defendants now reversed course and sought to obtain the highest possible price for STOP as sellers on the open market.

101.   During 2013, Defendants undertook a formal sale and due diligence process to identify potential outside buyers for STOP. This due diligence process – which was exactly what Defendant Logan had warned the SBA's Receiver only months earlier *not* to undertake – was highly successful.   On information and belief, thirteen potential buyers expressed serious interest; three of those buyers submitted bids; and two of the bidders were told to come back with their best offers.

102.   The highest bid was submitted by Securus Technologies Inc., which offered to acquire STOP for a total of $107 million, or $3.60 per share.  The price offered by Securus to Defendants was *eighteen times* higher than the 20 cents per share Defendants had paid to the Receiver only a year earlier.  Defendants had acquired Greentree's remaining interest in STOP from the Receiver for $3.25 million, and that same interest was now worth approximately $57 million.  Defendants accepted Securus' offer, and closed their sale of STOP in December 2013.

103.   On information and belief, no economic facts existed to justify the dramatic difference in STOP's valuation between the 20 cents per share Defendants paid the Receiver in November 2012, and the $3.60 per share Securus paid Defendants in an arm's length market transaction in December 2013.  On information and belief, STOP's own financial reports in 2012 and 2013 were both generally positive and did not make substantially different assessments of the company's prospects.

104.   The Defendants had put in between $10 and $15 million to acquire their interests in STOP in various transactions over the years, and accordingly they gained a total of between $95 and $100 million in profit on their sale to Securus.  On information and belief, STOP's CEO, Defendant Steven Logan, made about $10 million on the Securus sale.

105.    On information and belief, if Greentree had retained its interest in STOP into 2013 and conducted a due diligence process similar to the one conducted by Defendants, Greentree could have obtained a similarly high price for its STOP equity in an arm's length market transaction.  If Greentree had participated in the sale to Securus, Greentree would have received about $57 million for its interest in STOP rather than the $3.25 million it actually obtained in the receivership sale.  And if Greentree's ownership of STOP had not previously been diluted by the March 2010 insider transaction, its equity would have been worth an additional $10 to $11 million in December 2013, for a total sale price of up to $67 or $68 million.  All of the proceeds from such a sale would have gone to the SBA, which had priority over private investors, and would have made a substantial contribution toward paying off the $93 million that Greentree then owed, and still owes, to the SBA.

106.    On information and belief, Defendants never disclosed the terms of the Securus transaction to the SBA, and did not inform the SBA how much money they received from their December 2013 sale of STOP.

107.    Defendants' self-dealing and fraudulent conduct in seizing control of STOP through an insider deal, then engineering the bargain-basement receivership sale of STOP, and finally flipping STOP within a year for a price eighteen times what they had paid the SBA for it, caused an actual economic loss to the SBA on STOP alone that is measured by the difference between what the SBA actually received in the receivership sale, and the amount it could have received in an arm's length market transaction after a proper due diligence process.  In other words, as a result of Defendants' self-dealing and manipulation of the receivership process, the United States government was deprived of as much as $63.75–$64.75 million of STOP's value

(the difference between the $3.25 million the SBA actually obtained in the receivership sale, and the $67–$68 million Greentree would have received for its undiluted pre-March 2010 interest in STOP at the price offered by Securus).

108.    Furthermore, by their self-dealing and fraudulent conduct in steering Greentree's limited resources toward other failing companies in which they had separately invested, and diverting investment opportunities to their separate private funds, and by their mismanagement of Greentree to benefit their own interests, Defendants drove Greentree into financial collapse and receivership, causing an overall economic loss to the SBA of at least $93 million.

109.    By means of their self-dealing conduct in violation of the Small Business Investment Act and SBA regulations, their false certifications of compliance, and their false and misleading statements to the Receiver, Defendants avoided or greatly decreased their obligation to repay the government's investments in Greentree and in STOP.

110.    The government continues to be harmed by Defendants' conduct, because Greentree is still in receivership and the SBA still has not been made whole for the losses on its investments.

## VII.    COUNT 1 (VIOLATION OF FALSE CLAIMS ACT, 31 U.S.C. § 3729(A)(1)(G))

111.    Relator incorporates herein by reference the preceding paragraphs of this Complaint as though fully set forth herein.

112.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, one or more false records or statements material to an obligation to pay or transmit money or property to the government, or knowingly concealed or

knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the government, in violation of 31 U.S.C. § 3729(a)(1)(G).

113.    In particular, Defendants knowingly and/or recklessly filed reports with the SBA containing false certifications of truthfulness and of compliance with SBA regulations, in violation of the Small Business Investment Act, 15 U.S.C. §§ 687(h) and 687a, and of SBA regulations including 13 C.F.R. §§ 107.507; and knowingly and/or recklessly failed to disclose to the SBA that they were engaging in prohibited self-dealing transactions in violation of the SBIA, 15 U.S.C. §§ 687 *et seq.*, and of applicable SBA regulations, including 13 C.F.R. § 107.730. These false statements and material omissions were material to the SBA's decisions to approve the transactions in question, and, on information and belief, had it known the true facts about the insider nature of these transactions, the SBA would not have approved them.   Defendants' purpose in making these false statements and omissions was to enrich themselves by promoting the interests of their private investments in the Greentree portfolio holdings at the expense of Greentree's own interests, thereby improperly avoiding or decreasing theirs and Greentree's obligation to repay the money invested by the SBA, in violation of 31 U.S.C. § 3729(a)(1)(G).

114.    Defendants also knowingly concealed from the SBA the facts relating to the insider nature of the March 2010 transaction by which they acquired majority control of STOP at Greentree's expense.  Specifically, despite being advised by Relator Cowan of their obligation to disclose and seek approval from the SBA on each of these points, Defendants knowingly and willfully failed to disclose to the SBA the insider relationships between the participants, the change in corporate control that would result from the transaction, the interest rate that exceeded the SBA's maximum allowable rate, and the failure of Greentree to meet the "safe harbor"

requirement by investing on the same terms as the other participants and in the same relative proportion as in its original investment, in violation of 15 U.S.C. §§ 687 *et seq.* and 13 C.F.R. §§ 107.730, 107.855. These facts were material because, on information and belief, the SBA would not have approved the STOP transaction had it been aware of them. Defendants' purpose in concealing these facts from the SBA, on information and belief, was to take over majority control of STOP, Greentree's only successful portfolio company, and transfer a larger share of its equity from the SBIC to their own private investment vehicles, thereby improperly avoiding or decreasing theirs and Greentree's obligation to use any profits or proceeds gained from STOP to repay the money invested in STOP and in Greentree by the SBA, in violation of 31 U.S.C. § 3729(a)(1)(G).

115.   Defendants also knowingly manipulated the receivership process and made false and misleading statements to the SBA's Receiver regarding the valuation and marketability of STOP, by presenting a skewed appraisal report with an artificially low valuation, and by falsely advising the Receiver that conducting a due diligence process to identify other potential buyers would be harmful to STOP's value. These false and misleading statements were material because they influenced the Receiver, an agent of the United States government, to approve the sale of Greentree's interest in STOP at a fraction of its market value, without making any effort to solicit bids from other potential buyers. On information and belief, Defendants' purpose in making these false and misleading statements was to remove STOP entirely from Greentree and its obligations as an SBIC, so that they could turn it around and re-sell STOP privately without having to share any of the proceeds with the SBA, thereby improperly avoiding or reducing

theirs and Greentree's obligations to repay the money invested by the SBA in Greentree and in STOP, in violation of 31 U.S.C. § 3729(a)(1)(G).

116.    Defendants also knowingly concealed from the SBA the terms of their December 2013 sale of STOP to Securus, and the considerable amount of profit they realized from that sale, thereby improperly avoiding theirs and Greentree's obligations to repay the money invested by the SBA in Greentree and in STOP, in violation of 31 U.S.C. § 3729(a)(1)(G).

117.    As a result of the conduct set forth in this cause of action, the U.S. Government, through its agency the Small Business Administration, has suffered harm as a result of Defendants' concealment of their self-dealing transactions which, had the Government known the insider nature of those transactions, the Government would not otherwise have approved and/or allowed.

118.    By reason of the Defendants' acts in violation of the False Claims Act, the United States has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

## VIII.   COUNT 2 (VIOLATION OF FALSE CLAIMS ACT, 31 U.S.C. § 3729(A)(1)(C))

119.    Relator incorporates herein by reference the preceding paragraphs of this Complaint as though fully set forth herein.

120.    As detailed above, Defendants knowingly conspired with each other to commit acts in violation of 31 U.S.C., §§ 3729(a)(1)(G). Defendants committed overt acts in furtherance of the conspiracy as described above.

121.    As a result of the conduct set forth in this cause of action, the U.S. Government, through its agency the Small Business Administration, has suffered harm as a result of

Defendants' concealment of their self-dealing transactions which, had the Government known the insider nature of those transactions, the Government would not otherwise have approved and/or allowed.

122.    By reason of the Defendants' acts in violation of the False Claims Act, the United States has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

## IX.    PRAYER FOR RELIEF

WHEREFORE, Relator respectfully requests this Court to enter judgment against Defendants, as follows:

a.      That judgment be entered in favor of Relator and of the United States and against Defendants in the amount of three times the actual losses to the Small Business Administration on its investments in Greentree, STOP, and Greentree's other portfolio holdings resulting from Defendants' violations of the Small Business Investment Act, SBA regulations, and the False Claims Act, in an amount to be proven at trial, pursuant to 31 U.S.C. § 3729(a)(1);

b.      That judgment be entered in favor of Relator and of the United States and against Defendants for civil penalties of not less than five thousand five hundred dollars ($5,500) or more than eleven thousand dollars ($11,000) for each and every specific false or fraudulent claim or certification, false statement, or material omission made by Defendants, as may be identified at trial after full discovery, as provided for in 31 U.S.C. § 3729(a);

c.      That Relator be awarded the maximum amount allowed pursuant to 31 U.S.C. § 3730(d), including reasonable attorneys' fees and litigation costs;

d.      That judgment be granted for Relator and against Defendants for all costs, including, but not limited to, court costs, expert fees and all attorneys' fees incurred by Relator in the prosecution of this suit; and

e.      That Relator be granted such other and further relief as the Court deems just and proper.

## X.    DEMAND FOR JURY TRIAL

Relator, on behalf of himself and the United States, demands a jury trial on all issues so triable.

Dated: October 22, 2014

ST. ONGE STEWARD JOHNSTON &
REENS LLC

By: _____

GENE S. WINTER
Connecticut Bar No. $ct05137$
gwinter@ssjr.com
986 Bedford Street
Stamford, Connecticut 06905-5619
Telephone: (203) 324-6155
Facsimile: (203) 327-1096


FISH & RICHARDSON P.C.

JOHN S. GOETZ
*(admission pending)*
Connecticut Bar No. 423408
goetz@fr.com
601 Lexington Avenue, 52nd Floor
New York, New York 10022
Telephone: (212) 765-5070
Facsimile: (212) 258-2291

NATALIE L. ARBAUGH
*(pro hac vice* admission pending)
Texas Bar No. 24033378
arbaugh@fr.com
JOHN MICHAEL GADDIS
*(pro hac vice* admission pending)
Texas Bar No. 24069747
gaddis@fr.com
1717 Main Street Suite 5000
Dallas, Texas 75201
Telephone: (214) 747-5070
Facsimile: (214) 747-2091

**Attorneys for Relator
MICHAEL COWAN**